UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION


| | | |
|---|---|---|
| FRED BARON, Individually, ET AL., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | CIVIL ACTION NO. |
| VS. | ) | |
| | ) | 3:06-CV-1417-G |
| BARON & BUDD, P.C., ET AL., | ) | |
| | ) | **ECF** |
| Defendants. | ) | |


MEMORANDUM OPINION AND ORDER


Before the court is a motion by the plaintiffs Fred Baron ("Baron") and Lisa

Blue ("Blue") (collectively, "the plaintiffs") to remand this case to the state court

from which it was removed.  Additionally, the plaintiffs request the court to award

attorneys' fees stemming from the improper removal of this case.  For the reasons

stated below, the motion to remand is granted but the request for attorneys' fees is

denied.

I.  BACKGROUND

This case arises from a series of transactions in 2002 resulting in the sale of the

plaintiffs' interests in the defendant law firm of Baron & Budd, P.C. ("Baron &

Budd"), the consummation of individual services contracts between the plaintiffs and

Baron & Budd, and the amendment to the partnership agreement of a second law

firm, Silber Pearlman, LLP ("Silber Pearlman"). The plaintiffs are former

shareholders of Baron & Budd. Plaintiffs' Original Petition ("Petition") ¶¶ 3-4,

*attached to* Notice of Removal of Defendants Baron & Budd, P.C., Russell Budd, Steve

Baron, Brian Lidji, and LeBlanc Waddell, LLP ("Notice of Removal") *as* Exhibit 1-B.

In December 2002, Baron and Blue engaged in three transactions which significantly

altered their ownership interests in, and relationship to, Baron & Budd. The first

transaction involved the sale of their ownership interests in Baron & Budd to Russell

Budd ("Budd") in his individual capacity. *Id.* ¶ 11. In consideration for the sale of

their interests, the plaintiffs received certain immediate payments and promissory

notes from Budd. Purchase and Sale Agreement ("Sale Agreement") at A8, *attached to*

Defendants' Response to Plaintiffs' Motion to Remand and Supporting Brief

("Defendants' Response") at Tab 1.

The second and third transactions were services agreements between the

individual plaintiffs and Baron & Budd. Petition ¶ 11. At their core, the services

agreement conferred upon Baron and Blue the status of "of counsel" to Baron &

Budd. Services Agreement ("Baron Services Agreement") at A20, *attached to*

Defendants' Response at Tab 2; Services Agreement ("Blue Services Agreement") at

A27, *attached to* Defendants' Response at Tab 3. As consideration for "past services

rendered" and "future services" to be performed, the plaintiffs were to receive an annual salary; a bonus for the year 2002; "retirement benefits;" and "other benefits," which included medical benefits, access to facilities and resources, and use of company transportation.  Baron Services Agreement at A21- A22; Blue Services Agreement at A28-A29.  The services agreements encompass the period from December 2002 through December 31, 2009; all benefits owed to the plaintiffs under these agreements are due to the plaintiffs during this time period, including the totality of the "retirement benefits."  Baron Services Agreement at A23; Blue Services Agreement at A30.

Under these services agreements, the plaintiffs are to continue as employees of Baron & Budd with significant employment protection.  The only scenario through which the transfer of benefits would cease entirely is if the plaintiffs were terminated "for cause" -- defined as a felony conviction or a material breach of the exclusivity clause in the services contracts.  Baron Services Agreement at A24; Blue Services Agreement at A31.  If the plaintiffs are fired without cause, they continue to receive all benefits except access to facilities, resources, and company transportation.  Baron Services Agreement at A23-24; Blue Services Agreement at A30-31.  Were either of the plaintiffs to retire, become completely incapacitated or die during the term of the agreements, that plaintiff would be entitled only to the benefits designated as "retirement benefits" under the contract.  *Id.*

- 3 -

In December 2002, Baron was involved in a fourth transaction, this one

regarding his partnership interest in another law firm, Silber Pearlman.  In 2000, the

initial Silber Pearlman partnership agreement was executed; at that time, Baron's

ownership interest was 36.4 percent of the partnership.  Partnership Agreement of

Silber Pearlman, LLP ("Partnership Agreement") at A59, *attached to* Defendants'

Response at Tab 4.  That agreement was amended in October 2001.  First

Amendment to Partnership Agreement of Silber Pearlman, LLP ("First Amendment"),

*attached to* Defendants' Response at Tab 5.  As part of the 2001 amendments, the

partnership added a section regarding the distribution of the partnership's profits;

these distributions were to be made at the discretion of the managing partner.  *Id.* at

A61.  Also, the first amendment adopted section 8.4 of the partnership agreement,[1]

---

[1]     Section 8.4 of the amended partnership agreement reads in pertinent
part:

> **8.4 Payment to Partner on Withdrawal or
> Removal.**  On the date of withdrawal or
> removal (the "Departure Date"), such Partner
> (the "Departing Partner") shall immediately
> cease to have any rights in the assets, profits,
> files, records or affairs of the Partnership.
> The Partnership shall pay to the Departing
> Partner, within 60 days of the Departure
> Date, an amount (the "Departure Payment")
> equal to the Departing Partner's positive
> Capital Account balance, if any . . .

First Amendment at A62.

- 4 -

which created a redemption right whereby partners who withdrew from the firm were entitled to recover from the firm the positive value of their capital accounts. *Id.* at A62. In June of 2002, the Silber Pearlman partnership executed an agreement providing for the redemption of all partnership interests. Partnership Interest Redemption Agreement, *attached to* Defendants' Response at Tab 6. Simultaneously with the redemption agreement, the composition of the partnership was altered: the firm of Baron & Budd was admitted as a partner with a 75 percent share in the partnership; Baron, in his individual capacity, was readmitted to the partnership with a 15 percent share; and a third partner, Steve Baron (no relation to Fred Baron), was readmitted to the partnership with a 10 percent share. *Id.* at A64. In December 2002, a second amendment was made to the partnership agreement. That amendment named Baron & Budd as the managing partner for Silber Pearlman with Budd as Baron & Budd's designated representative. Second Amendment to Partnership Agreement of Silber Pearlman ("Second Amendment") at A67, *attached to* Defendants' Response at Tab 7. Additionally, the second amendment altered the distribution of partnership profits; specifically, the amendment required the managing partner, Baron & Budd, to "make regular and periodic distributions" of such profits to all three partners. *Id.* at A68. The second amendment also specified that Baron

would redeem his partnership interest on December 31, 2009 -- the same date that

his services agreement with Baron & Budd was due to expire.  *Id.* at A69.[2]

Baron alleges in the complaint that since the execution of these transactions,

the defendants have engaged in certain actions to dilute or devalue his interest in

Silber Pearlman.  Petition ¶ 11.  The plaintiffs further claim that the defendants have

taken actions to deny both Baron and Blue their rights under the various agreements.

*Id.* at ¶ 12.

The complaint was originally filed in the County Court at Law No. 3 of Dallas

County, Texas.  Notice of Removal at 1.  The defendants removed the case to this

---

[2]      The "redemption" section of the second amendment to the partnership
agreement reads:

> **8.5 Redemption of Fred Baron's
> Partnership Interest.**  Fred Baron agrees
> that his partnership interest shall be redeemed
> by the Partnership on December 31, 2009
> and that he shall be terminated as a partner of
> the Partnership as of such date, and the
> Partnership agrees to redeem Fred Baron's
> partnership interest in the Partnership in
> accordance with Section 8.4, treating
> December 31, 2009, as the Departure Date as
> therein defined.  The Partnership intends that
> this transaction will be a liquidation of Fred
> Baron's interest in the Partnership, and all
> payments to Fred Baron will be made
> pursuant to Internal Revenue Code Section
> 736(b).

Second Amendment at A69.

court pursuant to 28 U.S.C. § 1441(a) and 28 U.S.C. § 1331.  *Id.* ¶¶ 3-4.

Specifically, the defendants aver that this court has subject matter jurisdiction over

the underlying cause of action based on federal question jurisdiction because the

various agreements constitute a pension plan as defined and governed by the terms of

the Employee Retirement Income Security Act of 1974 ("ERISA").  *Id.* ¶¶ 5-7.

Additionally, the defendants argue that because at least some of the plaintiffs' claims

are governed by ERISA, all other claims are properly removed on the basis of

supplemental jurisdiction under 28 U.S.C. §§ 1367(a) and 1441(c).  *Id.* ¶ 9.

Following removal, the plaintiffs filed the instant motion to remand.  Docket Sheet.

## II.  ANALYSIS

### A.  Standard for Removal Jurisdiction

Title 28 U.S.C. § 1441(a) permits removal of "any civil action brought in a

State Court of which the district courts of the United States have original

jurisdiction."  Under this statute, "[a] defendant may remove a state court action to

federal court only if the action could have originally been filed in the federal court."

*Aaron v. National Union Fire Insurance Company of Pittsburg, Pennsylvania*, 876 F.2d

1157, 1160 (5th Cir. 1989), *cert. denied*, 493 U.S. 1074 (1990) (citations omitted).

Removal jurisdiction must be strictly construed, however, because it "implicates

important federalism concerns."  *Frank v. Bear Stearns & Co.*, 128 F.3d 919, 922 (5th

Cir. 1997); see also *Willy v. Coastal Corporation*, 855 F.2d 1160, 1164 (5th Cir.

- 7 -

1988).  Furthermore, "any doubts concerning removal must be resolved against removal and in favor of remanding the case back to state court." *Cross v. Bankers Multiple Line Insurance Company*, 810 F. Supp. 748, 750 (N.D. Tex. 1992); see also *Shamrock Oil & Gas Corporation v. Sheets*, 313 U.S. 100, 108-09 (1941); *Healy v. Ratta*, 292 U.S. 263, 270 (1934).  The burden of establishing federal jurisdiction is on the party seeking removal.  *Frank*, 128 F. 3d at 921-22; *Willy*, 855 F.2d at 1164.

There are two principal bases upon which a district court may exercise removal jurisdiction:  (1) the existence of a federal question and (2) complete diversity of citizenship among the parties.  *See* 28 U.S.C. §§ 1331, 1332.  The court can properly exercise jurisdiction on the basis of diversity of citizenship if the parties are of completely diverse citizenship and the case involves an amount in controversy of at least $75,000.  *See* 28 U.S.C. §1332(a).  District courts have federal question jurisdiction over civil cases "arising under the Constitution, laws, or treaties of the United States."  *See* 28 U.S.C. § 1331; *Frank*, 128 F.3d at 922.

Typically, whether an action should be remanded to state court must be resolved by reference to the plaintiff's pleading at the time of removal.  *State of Texas v. Alliance Employee Leasing Corporation*, 797 F. Supp. 542, 544 (N.D. Tex. 1992).  If the court can make this determination by reference to the plaintiff's complaint alone, the court need not go further.  However, should a district court need to go beyond

the pleadings to assess the propriety of removal, it may do so. *Id*. Here, the

defendants allege only federal question jurisdiction.

### B. Federal Question Jurisdiction

In determining whether a claim arises under federal law, the well-pleaded

complaint rule allows a plaintiff to be the "master to decide what law he will rely

upon" in pursuing his claims. *The Fair v. Kohler Die & Specialty Company*, 228 U.S.

22, 25 (1913); see also *Beneficial National Bank v. Anderson*, 539 U.S. 1, 6-7 (2003);

*Aaron*, 876 F.2d at 1160-61. Where potential remedies exist under both state and

federal law, a plaintiff may choose to proceed only under state law and avoid federal

court jurisdiction. *Caterpillar, Inc. v. Williams*, 482 U.S. 386, 392 (1987); *Carpenter v.*

*Wichita Falls Independent School District*, 44 F.3d 362, 366 (5th Cir. 1995). "There is

an exception to the well-pleaded complaint rule, though, if Congress 'so completely

pre-empt[s] a particular area that any civil complaint raising this select group of

claims is necessarily federal in character.'" *Arana v. Ochsner Health Plan*, 338 F.3d

433, 437 (5th Cir. 2003) (en banc) (quoting *Metropolitan Life Insurance Company v.*

*Taylor*, 481 U.S. 58, 63-64 (1987)), *cert. denied*, 540 U.S. 1104 (2004). Because the

plaintiffs' suit asserts claims arising only under state law, this court does not have

federal question jurisdiction unless federal law completely preempts at least some of

those state law claims.

1. *ERISA Preemption*

The Supreme Court has held that state-law claims seeking relief within the scope of ERISA § 502(a)(1)(B) must be recharacterized as arising under federal law, and as such, are removable to federal court. *Metropolitan Life*, 481 U.S. at 60, 67; see also *Ramirez v. Inter-Continental Hotels*, 890 F.2d 760, 762 (5th Cir. 1989). According to § 502(a)(1)(B), ERISA's civil enforcement provision:

> **§ 1132. Civil enforcement**
>
> **(a)  Persons empowered to bring a civil action**
>
> A civil action may be brought --
>
>> **(1)**  by a participant or beneficiary --
>>
>> * * *
>>
>> **(B)**  to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan . . . .

29 U.S.C. § 1132(a)(1)(B). When a claimant seeks relief "within the scope of [ERISA's] civil enforcement provisions," his or her claims are subject to *complete preemption*. *Metropolitan Life*, 481 U.S. at 66. Complete preemption "'recharacterizes' preempted state law claims as 'arising under' federal law for the purposes of . . .

- 10 -

making removal available to the defendant." *McClelland v. Gronwaldt*, 155 F.3d 507, 516 (5th Cir. 1998); see also *Johnson v. Baylor University*, 214 F.3d 630, 632 (5th Cir.), *cert. denied*, 531 U.S. 1012 (2000). To determine whether removal was proper, therefore, the court must examine the contours of the plaintiffs' state law claims as they relate to complete preemption.

The plaintiffs' complaint avers in broad language that the "[d]efendants . . . have (a) entered into transactions and taken affirmative actions to deny [Baron] and [Blue] their rights under the various agreements, (b) intentionally devalued and dismantled Silber Pearlman, and (c) failed and refused to pay [Baron] for certain services which he was induced by [the defendants] to provide to Baron & Budd." Petition ¶ 12. As legal causes of action, the plaintiffs claim: "breaches of contract, breaches of fiduciary duty, conspiracy to breach of fiduciary duty, tortious interference, conspiracy to tortious interference, fraud (or alternatively, negligent misrepresentation), conspiracy to fraud, fraudulent transfer, conversion, legal malpractice, negligence, unjust enrichment, and alternatively, promissory estoppel (and further alternatively, quantum meruit)." *Id.* ¶ 13. From this vague assertion of alleged infractions, the court is unable to determine on the face of the complaint whether the plaintiffs' state law claims, which were intended to remedy these alleged violations, are completely preempted by ERISA; thus the court must go beyond the

language of the petition to make its determination regarding subject matter jurisdiction.

The defendants argue that any cause of action arising from the four agreements are governed by ERISA because the agreements constitute a pension plan as defined and governed by ERISA. *See* Defendants' Response at 10. To make such a determination requires a three-step inquiry: (1) is there a "plan;" (2) if so, is it an ERISA plan; and (3) if so, is it a pension plan? An agreement constitutes a "plan" once four factors have been satisfied. See *Hansen v. Continental Insurance Company*, 940 F.2d 971, 977 (5th Cir. 1991). For an agreement to be a "plan," the court "must determine whether from the surrounding circumstances a reasonable person could ascertain [1] the intended benefits, [2] beneficiaries, [3] source of financing, and [4] procedures for receiving benefits." *Id.* If a plan exists, the court must go on to determine if the plan is of such a nature so as to be governed by ERISA. *Id.*

To be an ERISA plan, (1) the plan must be established and maintained by an employer and (2) the plan must serve the purpose of benefitting an employee. *Hansen*, 940 F.2d at 977. The Employee Benefits Security Administration of the Department of Labor further defines what constitutes an "employee benefit plan" under ERISA. The applicable regulation states that "the term 'employee benefit plan' shall not include any plan, fund or program . . . under which no *employees* are participants covered under the plan." 29 C.F.R. § 2510.3-3(b) (2004) (emphasis

added).  Paragraph (c) excludes from the definition of "employee" "a partner in a partnership," stating that partners "shall not be deemed to be employees with respect to the partnership."  *Id.* § 2510.3-3(c).  Generally, the courts have interpreted this section to mean that a plan is not considered to be between an employer and an employee if *all* parties to the plan are partners.  See *Vega v. National Life Insurance Services, Inc.*, 188 F.3d 287, 294 (5th Cir. 1999).  However, if a partner is a party to a plan that also governs non-partner employees, then that plan is considered to be between an employer and employee.  *Id.*

If the court determines that an ERISA plan exists, the court then must address whether the ERISA plan constitutes a pension plan.  By its terms, ERISA requires that for a plan to constitute a pension plan, the plan must provide either retirement income or deferral of income until retirement.  29 U.S.C. § 1002(2)(A).[3]  The

---

[3]    A pension plan is:

> any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that by its express terms or as a result of surrounding circumstances such plan, fund, or program --
>
> > (i)  provides retirement income to employees, or
> >
> > (ii)  results in a deferral of income by employees for periods

(continued...)

determination of whether a plan is designed to provide retirement income and/or deferral of income is an inquiry to be determined by all the surrounding circumstances.  *Id.*; see also *Murphy v. Inexco Oil Company*, 611 F.2d 570, 575 (5th Cir. 1980).

The defendants allege that the various agreements constitute a pension plan because the agreements provide for either retirement income or the deferral of income to the date of termination or beyond.  Notice of Removal ¶ 6.  The defendants point to three items as evidence of the fact that the agreements provide for retirement and/or deferred income:  (1) the "retirement benefits" section found in the services agreements; (2) the distribution benefits provided by the second amendment to the Silber Pearlman partnership agreement; and (3) the redemption benefits listed in the second amendment to the Silber Pearlman partnership agreement.  Defendants' Response at 2-3.

The defendants' first argument -- that federal question jurisdiction can be properly maintained based on the "retirement benefits" section of the services agreements -- is without merit; the plaintiffs have stipulated that they do not seek relief under the "retirement benefits" section of the services agreements.  Plaintiffs'

_____

[3](...continued)

> extending to the termination of
> covered employment or beyond
> . . . .

29 U.S.C. § 1002(2)(A).

Motion to Remand and For Fees, Shortened Briefing Schedule and Expedited Ruling and Memorandum of Law in Support ("Motion to Remand") at 4-5; Declaration of Fred Baron ¶ 2, *attached to* Motion to Remand at Tab A; Declaration of Lisa Blue Baron ¶ 2, *attached to* Motion to Remand at Tab B.  While the "retirement benefits" section of the services agreements could arguably be categorized as ERISA plans, the plaintiffs stipulated that their causes of action do not stem from this section of the contract.  Rather, their claims under the services agreements arise from the "other benefits" section of the agreements; specifically, the plaintiffs aver that they seek recovery for the use of office facilities, resources, and transportation.  When taking the stipulations into account, the court can say with confidence that the benefits sought by the plaintiffs under the services agreements are not retirement income or deferred income;[4] thus the claims stemming from the services agreements are not subject to ERISA.  See *Herrington v. J.R. Pounds, Inc.*, 874 F. Supp. 133, 138 (S.D. Miss. 1995) (remanding to state court in part because stipulations by the plaintiffs indicated the absence of a federal question).

In light of the stipulations, the only agreement that can constitute an ERISA pension plan is the amended partnership agreement.  Under the *Hansen* four-factor inquiry, the partnership agreement and its various amendments constitute a "plan" --

---

[4]      Nowhere in the defendants' response to the plaintiffs' motion to remand do the defendants allege that the salary, bonus, or "other benefits" of the services agreements constitute retirement income or income deferred to retirement.

- 15 -

a reasonable person is able to ascertain the intended benefits (the distribution and

redemption benefits), the beneficiaries (Baron), the source of financing (Silber

Pearlman's profits), and the procedures for receiving benefits (regular and periodic

disbursements of the distribution benefits, in accordance with section 8.4 of the

partnership agreement for the redemption benefits).  However, the partnership

agreement cannot survive the second threshold question -- whether this "plan" is an

ERISA plan.  The Silber Pearlman partnership agreement is not a plan as between an

employer and an employee but an agreement among partners.  A plan covering only

the partners of a law firm is not an ERISA plan because the partners are not

employees; if a plan covers no employees, then ERISA is inapplicable.  *Robertson v.*

*Alexander Grant & Company*, 798 F.2d 868, 870 (5th Cir. 1986), *cert. denied*, 479 U.S.

1089 (1987); *see also* 29 C.F.R. § 2510.3-3(c)(2).  Furthermore, the defendants

concede that Baron is not an employee of Silber Pearlman.  *See* Defendants' Response

at 16.

        In an effort to bring this partnership agreement under the rubric of ERISA, the

defendants ask the court to impute an employment relationship between Baron and

Baron & Budd with respect to the Silber Pearlman partnership agreement, arguing

that because Baron & Budd is the majority shareholder of Silber Pearlman, the

managing partner of Silber Pearlman, and the employer of Baron under the services

agreement, the relationship of Baron vis-a-vis Baron & Budd within Silber Pearlman

should take on the relation of employee/employer.  The defendants cite no authority to support this proposition, and the court is unpersuaded by their reasoning.  As of July 2002, Baron was a partner, along with Baron & Budd, in the Silber Pearlman partnership.  Though his role as a shareholder *of* Baron & Budd changed via the sales agreement, nothing changed in his role, within Silber Pearlman, as a partner *with* Baron & Budd.

Even if the court were to ignore the fact that the partnership agreement governs only partners and not employees of Silber Pearlman, these benefits -- the distribution benefits and the redemption benefits -- do not establish a pension plan because they represent neither retirement nor deferred income.  First, both the distribution benefits and the redemption benefits predate the second amendment to the partnership agreement; thus it cannot be said that the purpose of these benefits were to provide retirement income or deferred income to Baron.[5]  Though the method of distribution was altered in each of the subsequent amendments to the partnership agreement, the distribution benefits have been in place since the

---

[5]     The defendants attempt to characterize the granting of these benefits as arising under the terms of the December 2002 agreements.  In their response to the plaintiffs' motion to remand, the defendants assert that the "redemption and distribution benefits" were "established" by "Baron & Budd . . . for [Baron] as part of the parties' overall agreement" and that "Baron & Budd was the majority owner of Silber Pearlman when [the distribution and redemption] benefits were created".  Defendant's Response at 13.  However, the evolving partnership agreement, as reflected by the attachments to the response, contradicts these assertions.  Both the distribution benefits and the redemption benefits predate the second amendment.

inception of Silber Pearlman.  The first amendment to the partnership agreement altered the distribution scheme by placing the amount and time of distribution within the discretion of the managing partner.  The second amendment to the partnership agreement removed some of that discretion, requiring the managing partner to make regular and periodic payments to all partners.  While the redemption benefits did not exist under the original partnership agreement, these benefits similarly predated the December 2002 amendment.  The first amendment to the partnership agreement created the redemption benefits and provided that upon the removal or withdrawal of any partner, the departing partner was entitled to the positive balance in his capital account.  First Amendment at 3.

That the distribution benefit is not retirement income is further evidenced by the fact that the distribution benefit is not unique as to Baron.  Under the second amendment, while the managing partner's discretion has been reduced with regards to when and in what amount the profits are to be distributed, the managing partner is required to distribute the firm's profits to all three partners of Silber Pearlman -- Baron, Steve Baron, and Baron & Budd.  Were these distribution benefits to serve as retirement income for Baron, distinguishable from disbursements of profits typically associated with a partnership, the court would expect to find something unique about the benefits to Baron in contrast to those of the other partners.  The second amendment gives no hint, however, that the distributions to Baron are unique.  It

defies logic that as to Baron the distribution of profits was in anticipation of his retirement but as to the other partners the distribution of profits is a different form of compensation.

Similarly, because the redemption benefits are applicable to all partners, these benefits also do not qualify as retirement or deferred income.  The second amended partnership agreement states that at the date of termination from the partnership, Baron's interest will be redeemed within the meaning of section 8.4 of the partnership agreement.  Section 8.4 was added to the partnership agreement in the first amendment executed in 2001.  Thus, the substance of the partnership agreement indicates that any partner is entitled to these redemption benefits upon leaving the firm.  The only thing accomplished by the second amendment with regard to redemption benefits is to set the date when Baron must redeem his interest in the partnership.  Though the second amendment may have set Baron's date of retirement, it did not grant Baron any additional benefits in anticipation of retirement.

Furthermore, nothing from the "surrounding circumstances" evidences that the contracts, whether read individually or collectively, constitute a pension plan.  The defendants point to several factors which they believe indicate, either directly or indirectly, that the series of transactions constitute a pension plan:  (1) the considerable job security provided to Blue and Baron under the services agreement;

- 19 -

(2) the coinciding of the redemption date and the expiration of Baron's services agreement; (3) the age of Baron at the date of redemption; and (4) the statements by Baron referring to the transactions as a retirement agreement.

The defendants attempt to make much of the fact that the services agreements are generous to Baron and Blue in providing a substantial amount of protection from termination.  Essentially, the defendants argue that because Baron & Budd cannot discontinue paying benefits to the plaintiffs unless the plaintiffs are fired within the narrow definition of "for cause," the entire plan should be converted into an ERISA plan.  The court, however, cannot make such a leap.  Although the defendants argue that under the services agreements Baron and Blue essentially could discontinue working without suffering financial consequences, this has not proven to be the case. Also, the services agreement contemplates that the benefits during employment are to be something more than retirement income and that the relationship between Baron & Budd and the plaintiffs is to be one of active employment.  Evidence of this is the fact that the services agreements provide for reduced benefits should either Blue or Baron "retire" during the term of the contract.  The fact that the defendants were generous to Baron and Blue in an effort to assure their future goodwill and loyalty does not affect whether ERISA governs the terms of the plan.

Next, the defendants point to the fact that the expiration date of Baron's services agreement coincides with the exact date that he is required to redeem his

Silber Pearlman interest.  The defendants argue that because the lump sum redemption benefits will be paid within sixty days from the termination of his services agreement, the redemption benefits must constitute retirement or deferred income. This argument, however, ignores the fact that Baron was entitled to these redemption benefits prior to the December 2002 agreements; thus the redemption of his interest was not a right given in contemplation of retirement.  It appears, from a thorough review of the partnership agreement and subsequent amendments, that the only effect of the second amendment to the partnership agreement regarding redemption benefits was to set the exact date of redemption.  That Baron has chosen to redeem his partnership interest on the date that he will leave his employ with Baron & Budd does not convert his redemption rights into retirement income.

The defendants point to the fact that Baron will be sixty-two years of age at the time of redemption and expiration of the services agreement.  The defendants go on to argue that because age sixty-two is a common retirement age, the redemption benefits must be designed to provide retirement income.  Similar to the timing issue addressed above, this fact does not present a "surrounding circumstance" sufficient to transform the redemption rights which predate the December 2002 amendment into a pension plan.

Finally, the defendants point to statements made by Baron during two depositions unrelated to this suit in which he referred to the series of transactions as a

- 21 -

retirement agreement.  In the first deposition, Baron described himself as being an employee of Baron & Budd and that the transition from being a "shareholder" to an employee was memorialized in the "sale agreement."  Fred Baron Deposition 953:23-955:17, April 14, 2005, *attached to* Defendants' Response at Tab 8.  Additionally, he stated that the sales agreement was part of a retirement agreement.  *Id.*  In the second deposition, Baron again described his position with Baron & Budd as being that of an employee and stated that his compensation is a "fixed salary that was determined by a sales agreement" as "part of a separation/retirement agreement."  Fred Baron Deposition 8:6-9:24, Nov. 15, 2005 *attached to* Defendants' Response at Tab 9. While the court recognizes that Baron's subjective understanding of the various agreements is relevant to the surrounding circumstances under which they were executed, the classification or belief by either party that the plan in question is governed by ERISA is not conclusive.  See *Krug v. Caltex Petroleum Corporation*, 864 F. Supp. 11, 13 (N.D. Tex. 1994) ('[t]o call a program an ERISA plan . . . does not necessarily make it so"); *Taggert Corporation v. Efros*, 475 F. Supp. 124, 127(S.D. Tex. 1979) (holding that even though the plaintiff believed he was entering into an ERISA plan, the plan in question was not governed by ERISA because it did not satisfy the "definitional requirements in both form and substance"), *aff'd*, 617 F.2d 1208 (5th Cir. 1980), *cert. denied*, 450 U.S. 1030 (1981).  Thus, notwithstanding Baron's deposition testimony, the court adheres to the analysis set forth above.

- 22 -

Because none of the various agreements constitute an ERISA pension plan, the court finds that the doctrine of complete ERISA preemption is inapplicable in the case at bar. Accordingly, this court has no federal question jurisdiction over this case.

## C. Request for Attorneys' Fees

Under the "American Rule," each party is responsible for his own attorneys' fees; this is in contrast to the "British Rule" where the losing party pays the attorneys' fees of the prevailing party. See *Positive Black Talk Inc. v. Cash Money Records, Inc.*, 394 F.3d 357, 381 (5th Cir. 2004). There is no standard requiring an automatic award of attorneys' fees when it is determined that a cause of action was improperly removed to federal court. *Valdes v. Wal-Mart Stores, Inc.*, 199 F.3d 290, 292 (5th Cir. 2000). The award of attorneys' fees is made discretionary in removal cases by 28 U.S.C. § 1477(c). When determining whether to award such fees, the court is not to consider the motive of the removing party; rather, the court is to examine the objective merits of removal at the time of removal. *Valdes*, 199 F.3d at 293. "[T]he question we consider in applying § 1447(c) is whether the defendant had objectively reasonable grounds to believe the removal was legally proper." *Id.*

While the defendants' grounds for removal were ultimately found to be unmeritorious, the court is of the opinion that the defendants' claims were objectively reasonable. At the time of removal, the defendants only had the vague assertions contained in the plaintiffs' state court petition upon which to formulate their belief

- 23 -

that removal was proper.  The petition reads, "[d]efendants . . . have (a) entered into transactions and taken affirmative actions to deny [Baron] and [Blue] their rights under the various agreements."  Petition ¶ 12.  Nothing from the language of the petition indicates that Baron and/or Blue were excluding claims arising under the "retirement benefits" section of their respective services agreements.  Additionally, the plaintiffs' stipulations regarding the "retirement benefits" section of the services agreements were not submitted until after the case was removed.  Though the court need not decide whether the benefits listed in the "retirement benefits" section constitute an ERISA pension plan, it recognizes that the issue of whether a federal question exists in this case likely would have been much closer without the plaintiffs' stipulations.  Furthermore, the defendants' claims, even in light of the plaintiffs' stipulations, still presented a colorable claim for complete ERISA preemption.  Therefore, the award of attorneys' fees to the prevailing plaintiffs in this case is not warranted.

### III.  CONCLUSION

All doubts are resolved against removal.  *Cross*, 810 F. Supp. at 750.  Because the court finds that it lacks subject matter jurisdiction over any of the claims in this action, the plaintiffs' motion to remand is **GRANTED**.  The case is hereby **REMANDED** to the **County Court at Law No. 3 of Dallas County, Texas**.  The

clerk shall mail a certified copy of this memorandum opinion and order to the county clerk of Dallas County, Texas.  28 U.S.C. § 1447(c).

The plaintiffs' request for attorneys' fees is **DENIED**.

**SO ORDERED**.

November 6, 2006.

_____

A. JOE FISH
CHIEF JUDGE